ROGERS, Circuit Judge,
concurring in the judgment in Part VII and dissenting from Part VIII:
I join the Court’s opinion with two exceptions. First, in accordance with the Supreme Court’s instruction, portions of a co-defendant’s statements to investigators[1] *824 should have been admitted in Slatten’s defense, but not as a result of unduly expanding a narrow residual hearsay exception when the statements are covered by an established exception. Second, defendants’ Eighth Amendment challenge lacks any merit whatsoever, especially in view of the district court judge’s express assessment, which my colleagues ignore, that the sentences were an appropriate response to the human carnage for which these defendants were convicted by a jury.
I.
Concurring in the judgment in Part VII. I agree that the district court’s exclusion of certain statements by a co-defendant as inadmissible hearsay requires reversal of Slatten’s conviction. Op. 809-10. In my view, however, the district court did not abuse its discretion in finding the eo-defen-dant’s compelled statements untrustworthy to the extent they offered an exculpatory narrative of self-defense. Rather, the district court abused its discretion by failing, as a matter of law, to isolate certain inculpatory statements within that broader narrative to consider whether they were sufficiently trustworthy to be admitted under an exception to the hearsay rule. See Williamson v. United States, 512 U.S. 594, 600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). The co-defendant’s inculpatory statements were admissible in Slatten’s defense under Federal Rule of Evidence 804(b)(3),[2] and because they concerned the single most important issue underlying Slatten’s conviction—who fired the first shots that day—their exclusion implicated Slatten’s due process right to present a complete defense and was not harmless beyond a reasonable doubt. See United States v. Whitmore, 359 F.3d 609, 616 (D.C. Cir. 2004). Indeed, even if the statements’ exclusion did not impinge on Slat-ten’s constitutional right to present a complete defense, see Appellee Br. 128, the exclusion was not harmless because it had a “substantial and injurious effect” on the jury’s consideration of this close question. See United States v. Mahdi, 598 F.3d 883, 892 (D.C. Cir. 2010) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).
A.
In the immediate aftermath of the Nisur Square massacre, a co-defendant of Slat-ten’s offered statements on four different days to State Department investigators, one on a written departmental form and three oral. The oral statements, which were incorporated into written reports by State Department investigators, constitute hearsay within hearsay. Op. 804-05 n.7; Fed. R. Evid. 805. As a preliminary matter, the investigators’ contemporaneous recounting in their reports of what the co-defendant said falls within the business records exception under FRE 803(6). See United States v. Smith, 521 F.2d 957, 962-65 (D.C. Cir. 1975); Michael H. Graham & *825 Kenneth W. Graham, 30C Fed. Prac. & Proc. Evid. § 7047 & n.29 (2017 ed.); see also United States v. Warren, 42 F.3d 647, 657 n.7 (D.C. Cir. 1994). At this second level of hearsay, the question is whether the co-defendant said what he is reported to have said, not whether he was being truthful. See Smith, 521 F.2d at 965. The investigators personally witnessed the co-defendant making these statements. See-Fed. R. Evid. 803(6)(A). Furthermore, testimony established that State Department investigators regularly took such statements any time a contractor was involved in a shooting incident, see Fed. R. Evid. 803(6)(B)-(C); 11/2/09 Hearing Tr. 48:23-49:14, and it is “presumed that [the investigators] accurately transcribed and reported” the co-defendant’s statements. Smith, 521 F.2d at 965.
The difficulty with relying on the evaluative reports prong of the public records exception, see Op. 804-05 n.7, is that the records reflect only unverified witness statements about the Nisur Square massacre, rather than the investigators’, own “factual findings” about what occurred. See Fed. R. Evid. 803(8)(A)(iii). A “factual finding[ ]” in this context means a public official’s “conclusion by way of reasonable inference from the evidence,” not a piece of evidence gathered in aid of a potential conclusion down the road. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 164, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (quoting Black’s Law Dictionary 569 (5th ed. 1979)). For this reason, the relevant factors identified by Advisory Committee under this exception focus on the trustworthiness of the investigator’s conclusions (e.g., the skill or experience of the investigator, the investigator’s potential bias). See Notes of Advisory Committee on Proposed Rules, Fed. R. Evid. 803. Had State Department investigators concluded that the co-defendant’s version of events was credible and adopted it as their own, then FRE 803(8)(A)(iii) would likely come into play. See Beech Aircraft Corp., 488 U.S. at 169, 109 S.Ct. 439. Nothing in the reports, however, indicates that the investigators found any facts to be as the co-defendant portrayed them, and FRE 803(8)(A)(iii) “bars the admission of statements not based on factual investigation,” such as an eyewitness’s unverified statements to investigators. Beech Aircraft Corp., 488 U.S. at 169, 109 S.Ct. 439.
That leaves only the second level of hearsay, the co-defendant’s statements themselves. Although he was informed that the statements, if truthful, could not be used directly or indirectly against him in a criminal proceeding, he was also informed that they could be used in the course of a disciplinary proceeding and could result in termination of his employment. A statement that jeopardizes the declarant’s employment can be sufficient to trigger FRE 803’s pecuniary interest exception, provided it is so contrary to that interest that a reasonable person would not have made it unless it were true. Gichner v. Antonio Troiano Tile & Marble Co., 410 F.2d 238, 242 (D.C. Cir. 1969).
Taken together, the co-defendant’s statements offered a generally exculpatory version of events, in which the white Kia sped dangerously toward the convoy and ignored repeated warnings to stop, until it became necessary to fire upon and disable the Kia in order to protect the Raven 23 convoy. Within his narrative of self-defense, however, he offered details that had the potential to jeopardize his employment. Namely, he admitted that he “engaged and hit the driver,” Mem. Report of Interview at 1 (Sept. 16, 2007), “firfing] two rounds at the driver from his M-4 rifle ... [that] impacted the driver’s area of the windshield,” Mem. Report of Interview at 1 (Sept. 23, 2007). Most crucially, he acknowledged that he was “not aware of any *826 shots being fired before his,” Mem. Report of Interview at 2 (Sept. 20, 2007), and that he made eye contact with the driver just before firing, which further suggests that he was the first to fire. That is, following an incident in which multiple Raven 23 members were seen firing into the Kia, the co-defendant voluntarily singled himself out as the first shooter—the one likely responsible for the death of Al-Rubia’y and, in the government’s words, “the one who lit the match that ignited the firestorm.” 8/27/14 (AM) Tr. 27:1-4. Thus, if investigators doubted the claim that the Kia represented a threat, then the co-defendant’s statements all but ensured that he would lose his job.
The district court ruled that the co-defendant’s statements constituted inadmissible hearsay because their lack of trustworthiness disqualified them from the statement against interest exception, Fed. R. Evid. 804(b)(3), the business records exception, Fed. R. Evid. 803(6), and the residual hearsay exception, Fed. R. Evid. 807. In particular, it found that the co-defendant, “facing the threat of job loss or worse, had great incentive to provide a story of self-defense rather than a statement against his interest.” United States v. Slatten, Crim. No. 14-107, at 6 (D.D.C. June 16, 2014). This is true as a general matter, but it only answers part of the question. The co-defendant’s incentive to keep his job indicates why he might invent a self-defense scenario, and it illustrates why self-serving, exculpatory statements are inadmissible under FRE 804(b)(3). See Williamson, 512 U.S. at 599-600, 114 S.Ct. 2431. On the other hand, the co-defendant’s incentive to keep- his job does little to explain why he would falsely claim to have shot first and hit the driver, admissions that had the potential to single him out for greater scrutiny and punishment. To the contrary, the threat of job loss magnifies the likelihood that the co-defendant was telling the truth as to those details. See id.) Gichner, 410 F.2d at 242.
This failure to distinguish between incul-patory and exculpatory statements within this co-defendant’s larger narrative, and instead treating the entire four-part narrative as a single “statement” to be admitted or excluded as a whole, was legal error. Williamson, 512 U.S. at 599-600, 114 S.Ct. 2431; United States v. Smalls, 605 F.3d 765, 780-87 (10th Cir. 2010). A statement, within the meaning of FRE 804(b)(3), is a “single declaration or remark” rather than a “report or narrative,” Williamson, 512 U.S. at 599, 114 S.Ct. 2431 (quoting Webster’s Third New International Dictionary 2229 (1961)), and thus it was incumbent upon the district court to isolate and admit any “declarations or remarks within the [narrative] that are individually self-inculpatory.” Id. As the Supreme Court has noted, the fact that the narrative was generally exculpatory and untrustworthy does not mean it was entirely untrue: “One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.” Id. at 599-600, 114 S.Ct. 2431.
To determine whether the error was harmless requires consideration of the antecedent question whether any statements within the co-defendant’s narrative were sufficiently self-inculpatory to be admissible as statements against interest: See Fed. R. Evid. 804(b)(3)(A). If so, then in light of the numerous other pieces of evidence suggesting that the co-defendant fired first, the error could not possibly have been harmless. Although the jury could have reasonably credited Jimmy Watson’s testimony that Slatten fired first over the traffic officers’ testimony that someone in the co-defendant’s position did so, the officers’ testimony would take on new significance if buttressed by the co- *827 defendant’s own admission to firing first. The eo-defendant’s claim to have fired first and hit the Kia driver was admissible because no reasonable person would have falsely so claimed, thereby setting the day’s tragic events in motion, especially given the near-certainty that such statements would cost him his job if the self-defense claim were disbelieved. See Fed. R. Evid. 804(b)(3)(A).
The government maintains that the “I shot first and hit the driver” statement cannot be separated from the self-defense statement, ie., “I shot first and hit the driver in order to protect my team from an imminent threat.” See Appellee Br. 121. The government is correct that a statement’s context must be carefully considered in determining whether the statement is truly self-inculpatory, Williamson, 512 U.S. at 603, 114 S.Ct. 2431, but to the extent the government suggests that the court can only consider for admission the conjoined self-defense statement in his narrative, rather than considering for admission only the “I shot first and hit the driver” statement, Williamson instructs to the contrary. The Supreme Court made clear that courts must narrowly parse statements submitted under FRE 804(b)(3) and independently analyze each “declaration[ ] or remark” within such a statement for admissibility; parts of statements that are not self-inculpatory may not be admitted solely based on their proximity to other self-inculpatory declarations. Id. at 599-601, 114 S.Ct. 2431. Here, the inverse is true—the district court erred in excluding self-inculpatory declarations solely based on their proximity to other self-exculpatory declarations.
The relevant self-inculpatory “declarations or remarks” within the co-defendant’s narrative statement, id. at 599, 114 S.Ct. 2431, are:
“[I] engaged and hit the driver,” Mem. Report of Interview at 1 (Sept. 16, 2007); “[I] made eye contact with the driver of the white sedan[,]
... an Arabic male in his late 20’s with a beard .... [I] fir[ed] two rounds at the driver from [my] M-4 rifle. [I] believe[ ] these rounds impacted the driver’s area of the windshield,” Mem. Report of Interview at 1 (Sept. 23, 2007); and “[I am] not sure whether [I] was the first one to fire during this incident. [I am] not aware of any shots being fired before [mine],” Mem. Report of Interview at 2 (Sept. 20, 2007).
Certainly, the reliability of those statements must be considered in light of the broader self-defense context, but the context is not actually a part of those inculpa-tory statements. On the other hand, the co-defendant’s statement “Fearing for my life and the lives of my teammates, I engaged the driver and stopped the threat” is generally self-exculpatory and therefore inadmissible. Sworn Statement at 2 (Sept. 18, 2007).
The government makes the related point that an assertion of self-defense automatically removes the underlying admission from the statement against interest exception. In its view, a self-defense claim can never be sufficiently contrary to self-interest under FRE 804(b)(3) because, if true, it would wholly exonérate the declarant. See also Op. 805-06 (citing United States v. Henley, 766 F.3d 893, 915 (8th Cir. 2014); United States v. Shryock, 342 F.3d 948, 981 (9th Cir. 2003)). Once again, Williamson controls: any such generalization is inappropriate because determining whether a statement is self-inculpatory is a “fact-intensive inquiry, which ... require[s] careful examination of all the circumstances surrounding the criminal activity involved.” Williamson, 512 U.S. at 604, 114 S.Ct. 2431.
*828 In Shryock, 342 F.3d at 966-67, for instance, the police already had multiple pieces of evidence showing that the declar-ant shot the victims, and thus the declar-ant’s self-defense statement to police was much more obviously exculpatory—the admission “I shot the victims” provided the police with nothing they did not already know or strongly suspect. Here, on the other hand, the record indicates that in the immediate aftermath of the Nisur Square massacre, the co-defendant provided investigators with the very first evidence that he fired before anyone else in the convoy and that he also hit the driver. One can imagine circumstances in which a self-defense claim would be even more devastating, e.g., a person walking into a police station and claiming self-defense in a long-forgotten murder, leading police to reopen the case and immediately find evidence disproving the implausible self-defense claim. Invoking a blanket rule to the contrary seems to suggest that a statement can only be sufficiently damaging to self-interest if, standing alone, it is enough to support a conviction, a civil judgment, or termination. See Op. [805-06]. Thus, an admission to four elements of a crime (but not the fifth) would not qualify as a statement against interest, nor, as here, would an admission to a killing so long as self-defense is also claimed. This court has rejected that notion: “[T]he mere fact that the statements alone do not create an inference of guilt beyond a reasonable doubt does not remove them from the ambit of Rule 804(b)(3).” United States v. Wilson, 160 F.3d 732, 739 & n.4 (D.C. Cir. 1998).
Turning to the statements at issue, the question is whether a reasonable person in the co-defendant’s position would falsely claim to have shot first and hit the driver, even in the context of a self-defense narrative. Fed. R. Evid. 804(b)(3)(A). As the government points out, State Department investigators likely knew (or would soon learn) that this co-defendant fired at the Kia, so he would have been ill-advised to deny he had. That said, investigators also knew (or would soon learn) that numerous other Blackwater guards fired at the Kia around the same time. Thus, with investigators facing the daunting task of piecing together who did what in the midst of a melee, would a reasonable person in the co-defendant’s position claim (1) ignorance as to who shot when and where, essentially hiding behind the “fog of war;” (2) to have fired defensive shots into the Kia’s engine block only after other Raven 23 members had opened fire engaging the driver; or (3) affirmatively admit that he was the first, and likely fatal, shooter? In other words, if in reality this co-defendant had fired fourth and hit only the engine block, then why would he falsely claim responsibility for shots that likely killed a man?
The government suggests that because State Department protocol required guards to shoot occupants of cars that refused to stop despite warnings, the co-defendant could have falsely claimed to have shot first and hit the driver in order to portray himself as having “done precisely the right thing (the heroic thing, even).” Appellee Br. 122. Such an implausible high-risk high-reward strategy would only make sense if one were absolutely confident the self-defense claim would hold up; if not, the heroic narrative would give way to something far more troubling, with devastating consequences for the co-defendant. On the other hand, if at all concerned about the self-defense narrative being rejected, a reasonable person in the co-defendant’s position would have claimed to have fired fourth and hit the engine block because such shots would ultimately be of little consequence even if fired without justification. Based on the evidence adduced at trial showing that the Kia had come to a stop before any shots were fired, the co- *829 defendant would have had little reason to feel so confident in the self-defense claim. Instead, it is far more likely that the co-defendant offered these inculpatory details because they were true, in order to lend credence to his flimsy self-defense narrative. See Williamson, 512 U.S. at 599-600, 114 S.Ct. 2431. Indeed, even the co-defendant’s expression of uncertainty as to shooting first (“[I am] not aware of any shots being fired before [mine]”) indicates that he was being truthful in that he would be unlikely to undercut his own lie by expressing doubt about it. As such, the co-defendant’s inculpatory statements were sufficiently trustworthy and contrary to his pecuniary interest to qualify for admission under FRE 804(b)(3).
The requirement to show “corroborating circumstances that clearly indicate ... trustworthiness” does not apply to statements against pecuniary interest, Fed. R. Evid. 804(b)(3)(B), but the existence of such corroborating circumstances here further demonstrates the admissibility of the inculpatory portion of the. co-defendant’s statements. Not only did multiple witnesses similarly describe the first shots as hitting the driver’s side windshield, and multiple others similarly described two initial shots, but Officer Monem testified that a specifically-located gunner fired the first shots, and, crucially, Officer Al-Hamidi testified he was “100 percent certain” that the first shots came from “the [same location] of [a particular] vehicle,” 7/2/14 (PM) Tr. 35:4-15, which was the co-defendant’s position that day. Moreover, Jeremy Krueger, in the second convoy vehicle, testified that the first shots sounded like the 5.56 ammunition used by the co-defendant, rather than the 7.62 ammunition used by Slatten, while Jeremy Ridgeway testified that a few days after the massacre the co-defendant said to him “I feel like this is my fault.” 8/4/14 (PM) Tr. 13:15-14:16. It is difficult to imagine why the co-defendant would seem to accept such responsibility, especially to someone like Ridgeway who would later confess to multiple killings, unless the co-defendant believed he was the one who started the shooting.
That the co-defendant’s inculpatory statements are sufficiently trustworthy to be admitted under an exception to the hearsay rule does not necessarily mean they are true. Nor does it mean that, even if the co-defendant believed they were true, he was correct in thinking he fired first. Rather, it simply means that the statements are trustworthy enough to be presented to a jury, which on retrial can consider all of the available evidence in determining whether or not Slatten fired the first shots that day. The government’s position that any error was harmless because of the strength of the evidence that Slatten fired first, see Appellee Br. 128-29, highlights the importance of a jury making this determination. On remand, the government can make its argument to .the jury that the co-defendant’s “equivocal out-of-court response to an investigator,” given the falsity of other aspects of his statement, “surely, [should not] turn[ ] the tide” and prevent a second conviction of Slatten. Id. at 129.
In sum, because the co-defendant’s in-culpatory statements are admissible as statements contrary to pecuniary interest and thus “specifically covered,” see Fed. R. Evid. 807, FRE 804(b)(3) is properly relied upon rather than FRE 807’s residual exception to the hearsay rule. See United States v. Earles, 113 F.3d 796, 800 (8th Cir. 1997).
B.
In any event, there appears good reason not to rely on FRE 807 here. Not only is the district court is “vested with considerable discretion” to apply the residual hear *830 say exception, United States v. Kim, 595 F.2d 755, 766 (D.C. Cir. 1979), this court has repeatedly emphasized that FRE 807 “was intended to be a narrow exception to the hearsay rule, applied only in exceptional cases,” when the district court would otherwise be forced to exclude evidence that is “very important and very reliable.” Id. FRE 807 requires “circumstantial guarantees of trustworthiness” equivalent to those ensured by FRE 803 and FRE 804, and if my colleagues do not trust the veracity of self-serving statements under FRE 804(b)(3), see Op. 805-06, then it seems illogical to admit those same statements under FRE 807 merely because the co-defendant was under oath, immunized from criminal liability except for the remote possibility of prosecution for making false statements under 18 U.S.C. § 1001, and repeated his statements several times. But see Op. 807-09. Underscoring this point, the investigators’ reports reflect a certain skepticism about the co-defendant’s trustworthiness, at one point noting that he had failed to mention firing his M-203 grenade launcher in prior statements, which the co-defendant “claimed that he had not documented firing ... because he ‘didn’t think it was important.’ ” Mem. Report of Interview at 3 (Sept. 23, 2007).
Further, the evidence identified as corroborating the self-defense narrative— which the jury necessarily rejected in reaching its verdict1—is misconstrued by my colleagues. See Op. 808-09. The co-defendant told the State Department investigators that traffic in Nisur Square came to a stop upon the convoy’s command, but when the white Kia then approached the convoy at a high rate of speed, he threw a water bottle as a warning prior to firing the first shots. By contrast, Officer Al-Hamidi testified that when Raven 23 members threw water bottles, he turned to see that all traffic was stopped, then he turned back to the convoy as the first shots were fired. Al-Hamidi’s testimony thus in no way corroborates the co-defendant’s self-serving claim that he threw a water bottle at a speeding Kia as a warning, and to construe it otherwise only amplifies the error in deeming the self-defense portions of the narrative admissible.
Finally, reliance on FRE 807 for admission of the co-defendant’s statements as a whole generally ignores both Williamson, 512 U.S. at 599-600, 114 S.Ct. 2431, and Slatten’s clarification that he is not seeking admission of the portions of the co-defendant’s statements that the government claims are self-serving, such as that the Kia approached at high speed, did not stop despite the co-defendant’s attempts to stop it, or that the co-defendant feared for his life. See Slatten Br. 40. But see Op. 802-03, 810-11. Although I too conclude that the district court abused its discretion, Slat-ten’s challenge to the denial of his motion for severance does not require the Court to reach FRE 807 in order to grant him the relief he seeks (or, indeed, relief he expressly does not seek), and therefore I would not do so.
Accordingly, I concur in the judgment that the district court abused its discretion in denying admission of the co-defendant’s statements, to the extent I have identified in view of the analysis Williamson requires.
II.
Dissenting from Part VIII. Paul Slough was convicted by a jury of killing thirteen (13) people and attempting to kill seventeen (17) others. Evan Liberty was convicted by a jury of killing eight (8) people and attempting to kill twelve (12) others. Dustin Heard was convicted by a jury of killing six (6) people and attempting to kill eleven (11) others. Even leaving aside their *831 firearms convictions under 18 U.S.C. § 924(c), the maximum sentences on their remaining convictions were 249 years for Slough, 164 years for Liberty, and 137 years for Heard. Especially in light of that congressionally determined exposure, the thirty-year-and-one-day sentences imposed by the district court were not unconstitutionally “grossly disproportionate to the crime[s].” Graham v. Florida, 560 U.S. 48, 60, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (internal quotation marks omitted).
Today my colleagues hold that the mandatory sentence of thirty years under Section 924(c), as applied to these three private security guards for using government-issued weapons in a war zone, is cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution. Op. 819-20. In so doing, they have failed to account, as they must, for “all of the circumstances of the case.” Graham, 560 U.S. at 59, 130 S.Ct. 2011. Most crucially, my colleagues make no mention of the fact that the district court judge, who presided at the months-long trial, imposed sentencing packages that the judge concluded “achieved an overall appropriate sentence [for each of these defendants] rather than calculating individual sentences for each component.” Sent. Tr. 150:18-25 (Apr. 13, 2015) (citing United States v. Townsend, 178 F.3d 558, 567 (D.C. Cir. 1999)). That is, in consideration of the mandatory minimum under Section 924(c), the district court imposed only a one-day sentence for all of these defendants’ many manslaughter and attempted manslaughter convictions. The Supreme Court has affirmed the district court’s discretionary authority to impose such a sentencing package in Dean v. United States, — U.S. —, 137 S.Ct. 1170, 197 L.Ed.2d 490 (2017), holding that nothing in Section 924(c) prevents a district court from, as here, mitigating the harshness of a mandatory thirty-year minimum by imposing a one-day sentence for the predicate convictions. See id. at 1176-77.
My colleagues’ conclusion that there has been a constitutional violation, by contrast, rests on the mistaken premise that the thirty years allocated to the Section 924(c) convictions represent freestanding sentences distinct from the one-day sentences on the remaining manslaughter and attempted manslaughter convictions. See Op. 812; Townsend, 178 F.3d at 567. In disregarding the basic structure of these defendants’ sentences, my colleagues fail to recognize that the district court already mitigated any disproportionality. Indeed, the district court judge stated on the record that he was “very satisfied” with the thirty-year sentences in light of the “many killings and woundings” for which these defendants were responsible. Sent. Tr. 154:9-22. My colleagues ignore this fact too, particularly when they suggest that the district court judge felt constrained to impose an unduly harsh sentence. See Op. 814-15. And whatever their concern with the “one-size-fits-all nature of these sentences,” see id. at 815, that is not an Eighth Amendment concern because none of the sentences are disproportionate to the enormity of the crimes that the jury found the defendants had committed. Graham, 560 U.S. at 60, 130 S.Ct. 2011. Again, Congress has determined that the least culpable, defendant here—who was convicted of killing six people and wounding eleven others—should be subject to a maximum of 167 years in prison, in addition to the thirty years under Section 924(c).
Although it is possible to imagine circumstances in which a thirty-year minimum sentence for a private security guard working in a war zone would approach the outer bounds of constitutionality under the Eighth Amendment, this is not that case. *832 The jury rejected these defendants’ claim that they fired in self-defense, and far more of their fellow security guards chose not to fire their weapons at all that day. Yet as my colleagues apparently see it, Congress should have included an exception for all such military contractor employees, or, rather, it would have included such an exception if it had only considered the issue. See Op. 812-13. Perhaps so, but that is not the question before us. The district court judge made an individualized assessment of an appropriate sentencing package for each of these defendants, and the result is not disproportionate to the defendants’ crimes, let alone grossly, unconstitutionally disproportionate.
Accordingly, I respectfully dissent from Part VIII.

. See Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); United States v. Slough, 641 F.3d 544, 549 (D.C. Cir. *824 2011); Gov’t’s Resp. to Order to Show Cause, filed under seal (Jul. 24, 2017).

. Federal Rule of Evidence 804(b)(3) provides an exception to the Rule against Hearsay for a statement against interest that:
(A) a reasonable person in the declarant’s position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant’s proprietary or pecuniary interest or had so great a tendency to invalidate the declar-ant’s claim against someone else or to expose the declarant to civil or criminal liability; and
(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.